Whitaker, Judge,
delivered the opinion of the court:
Plaintiff sues for the increased wages it was required to pay on a contract with defendant for the construction of a part of a housing project at Massena, New York, and for the cost of repairing certain piers and footings which were damaged by frost.
Its claim for increased wages are for those paid carpenters and common laborers employed on the project. The circumstances under which the increases were paid to the carpenters differ somewhat from those under which the increase was paid to common laborers. We shall discuss first the increased wages paid the carpenters.
1. The Davis-Bacon Act (Act of March 3, 1931, 46 Stat. 1494, as amended by the Act of August 30,1935,49 Stat. 1011, title 40, U. S. C., sections 276a to 276a-6), provides that the specifications for every contract for public buildings or public works should contain a provision setting out the minimum wages to be paid mechanics and laborers and that this minimum should be the wages determined by the Secretary of Labor to be the prevailing wages therefor in the community in which the work was to be done.
On August 10,1942, the Secretary of Labor had determined that the prevailing wage for carpenters for the locality in *346 which Massena, New York, is located was $1.25 and the prevailing wage for laborers was 65 cents. The contract in this case was executed on December 2, 1942, and it, accordingly, in the specifications, required plaintiff to pay not less than these wages.
Previous to the execution of the instant contract plaintiff and defendant had entered into a contract on June 9, 1942, for the construction of another part of this housing project. This contract contained the same provisions as to wages as that contained in the instant contract, but plaintiff had been compelled to pay carpenters under the former contract $1.35 an hour. The two contracts covered units in the same housing project, and the carpenters refused to work, for less than $1.35 on the second unit of the project.
Before the instant contract had been executed on December 2,1942, the Stabilization Act of October 2,1942 ( 56 Stat. 765, 767), had been enacted and the President had issued Executive Order 9250, which provided that there should be no increase or decrease in wages without the approval of the National War Labor Board and which prohibited this Board from increasing wages above those prevailing on September 15, 1942, unless necessary to correct inequalities, etc. Inasmuch as the Secretary of Labor had determined that the prevailing wage for carpenters on August 10,1942, was $1.25 plaintiff was thus prohibited by the Stabilization Act and this Executive Order from paying the wages of $1.35 demanded by the carpenters. However, it did so nevertheless up until February 23, 1943. On that date it notified the carpenters' union that in view of the Executive Order it could not pay more than $1.25. The carpenters refused to work for these wages and as a result no carpenter work was done on the project from February 23, 1943, until June 4, 1943.
The carpenters union undertook to get the Wage Adjustment Board, a subsidiary of the National War Labor Board, to authorize an increase in the wage rates, but plaintiff refused to participate in these proceedings, partly for the reason that considerable delay would be encountered before action could be secured from this Board. Instead, it appealed to the Federal Public Housing Authority to settle *347 the problem. Plaintiff’s representatives had a conference with the Assistant Director of the Labor Relations Division of the Federal Public Housing Authority in Washington. This official agreed that he would undertake to get the Secretary of Labor to amend the determination of August 10, 1942, fixing the prevailing wages for carpenters at $1.25, if plaintiff would agree that this modification of the previous determination would involve no increased cost to the Government. The Assistant Director understood plaintiff to agree to this, and he, accordingly, took them to the office of the Assistant Solicitor of the Wage Determination Section of the Department of Labor. The Assistant Solicitor also understood plaintiff to agree that a modification of the determination of August 10, 1942, would involve no increase to the Government and, with this understanding, he induced the Secretary of Labor to modify the determination of August 10, 1942, by declaring that the prevailing wage on that date was $1.35 instead of $1.25.
Plaintiff denies that its representatives made any such agreement. The record indicates that they did not expressly do so, but it also indicates that by their conduct and whatever they may have said and by what they left unsaid, they gave these two officials the impression that they would make no claim against the Government for the difference between the $1.25 rate and the $1.35 rate. '
In addition to denying that they made any such agreement, plaintiff says that, irrespective of whether they did so or not, they are entitled to the increase because the determination of the Secretary of Labor was made pursuant to the Secretary’s official duty and was a determination made necessary by the facts and that it was not one induced by any promise they may have made, and, therefore, they are not bound by the promise, if made.
Legally, plaintiff may be correct, whatever may be said of the morality of their conduct, but we do not think the case turns on any agreement they may have made.
The Davis-Bacon Act required that the contract should contain a provision that the contractor should pay not less than the minimum wage fixed in the contract, which should be that wage which had been determined by the Secretary of *348 Labor to be the prevailing wage in the community. The Secretary of Labor had determined that $1.25 was the prevailing wage, and the contract contained a provision requiring the contractor to pay not less than this wage. The provisions of the contract were in exact accordance with the facts and with the law. But the contractor says that the Secretary of Labor had made a mistake in this determination of the prevailing wage and that having contracted upon the basis of the determination as made, it is entitled to recover the excess amount it was required to pay.
"We do not think this position can be maintained in view of the provisions of paragraphs c and d of article 6 of the Special Conditions of the Specifications. Paragraph c contemplates that there may be a change in the determination of the prevailing wage as made by the Secretary of Labor prior to the execution of the contract, and it provides that the contractor shall pay not less than the wages which the Secretary of Labor may from time to time determine as the prevailing wage. This section reads:
The determinations of the Secretary of Labor shall be deemed to establish the minimum wages which may be paid to the designated laborers and mechanics * * *
Inasmuch as the minimum wage specified to be paid in paragraph a of article 6 was based upon the last determination of the Secretary of Labor prior to the execution of the contract, the only purpose of paragraph c was to require the contractor to pay any minimum wage that might be determined by the Secretary of Labor after the execution of the contract. This would seem to cover any later determination, whether it was brought about by changed conditions or by a mistake in the previous determination. The contractor, therefore, knew that the Secretary’s determination was not final, that it might be changed, for one cause or another, and it agreed to pay the wages based upon these determinations.
The Government did not warrant that $1.25 was the, prevailing wage nor that it would remain the prevailing wage. On the contrary, paragraph d provides that:
The specified wage rates are minimum rates only, and the Government will not consider any claims for ad *349 ditional compensation made by the Contractor because of payment by the Contractor of any wage rate in excess of the applicable rate contained herein. * * *
The contractor knew that it might have to pay wages in excess of those stated in paragraph a of article 6 and it knew further that the Government had specified that in this event it would not be liable for the increase.
Manifestly, this case differs from that of Albert & Harrison, Inc. v. United States, 107 C. Cls. 292 [certiorari denied, 331 U. S. 810]. In that case the contract represented that the Secretary of Labor had determined the prevailing wage for bricklayers to be $1.50, whereas the Secretary had in fact determined that the prevailing wage was $1.75. In that case the Government misrepresented the facts and we allowed recovery. Here they stated the facts as they were; there has been no misrepresentation and, hence, there can be no recovery.
Furthermore, the Secretary of Labor modified the former determination of August 10, 1942 in response to plaintiff’s request for assistance in solving the dilemma created by the refusal of the carpenters to work for what the Secretary had determined was the prevailing wage and the prohibition of the Executive Order against the payment of higher wages. It seems little short of unconscionable for the plaintiff to undertake to base its action against the defendant on an act done for its benefit. Besides, the sole basis for the modification of the prior determination was that plaintiff itself had been paying on the prior contract $1.35 instead of $1.25. The Secretary of Labor had no information as to what other employers of labor in the community were paying carpenters. Plaintiff, therefore, could not have been misled by the Secretary’s determination of August 10, 1942. It is only those misrepresentations which actually mislead and are relied upon that give rise to liability. See cases cited in 23 Am. Jr. 939-944.
2. The contract fixed the minimum wage to be paid common laborers at 65 cents. This was in accordance with the Secretary of Labor’s determination of the prevailing wage, and there had been no change in that determination. However, a proceeding was begun before the Wage Adjustment *350 Board to permit an increase in these wages and that Board on February 9, 1943, ruled “that the wage rate of laborers be increased from 65 to 80 cents per hour.”
Thereafter, plaintiff undertook to get the defendant to agree to pay this increase, but the defendant refused to do so. Plaintiff apparently refused to pay the increased wages and defendant, in order to require it to do so, wrote it on May 19, 1943, as follows:
This office has just been advised that failure to pay the adjusted laborers’ wage rate; i. e., 80‡ per hour, from and after February 9,1943, is a noncompliance with the terms of your contract. You are therefore advised that, unless supplemental pay roll records are submitted showing payment of the increased rate, the noncompliance, will be reported as such to the United States Department of Labor.
After receipt of that letter plaintiff paid 80 cents an hour to all laborers employed on the project after February 10, 1943.
The project engineer was wrong in saying that plaintiff’s failure to pay the 80 cents an hour was a noncompliance with its contract. The contract required no more than that plaintiff pay a minimum of 65 cents an hour. Nor did the ruling of the Wage Adjustment Board require it to pay 80 cents an hour. This ruling amounted to no more than permission tq pay as much as 80 cents an hour. It was not a requirement that they do so. Employees Group of Motor Freight Carriers v. National War Labor Board, 143 F. (2d) 145.
But whether erroneous or not, it is nevertheless true that it was this letter of defendant’s project engineer which induced plaintiff to pay the increased rate. Article 17 of the contract required the contractor to pay wage rates not less than those stated in the specifications, and it also subjected it to severe penalties for failure to do so. It gave the contracting officer the right to withhold from the contractor enough of the accrued payments due it to pay the laborers and mechanics any deficiency in the amount which the contractor was required to pay, and it gave the Government the right to terminate the contractor’s right to proceed *351 with the work. If the contractor’s failure to pay the 80 cents allowed by the Wage Adjustment Board was in truth a noncompliance with the wage provision of its contract, then the contractor was subject to the penalty of having the payments due it withheld to an extent sufficient to pay the laborers the 80 cents an hour, and it was subject to the penalty of having its contract terminated. The demand of the project engineer that it pay the 80 cents an hour was, therefore, one the contractor could not afford to ignore.
Plaintiff paid the increased wages as a result of this wrongful demand of the defendant’s representative in charge of the work and, hence, defendant should pay the increased cost resulting therefrom. Defendant put this man in charge of the work and clothed him with authority to see that the contract was carried out. If he made a demand on the contractor which the contract did not justify and the contractor was put to increased cost in order to comply with this demand, the defendant is liable therefor.
It is no answer to say that the contractor would probably have had to pay the increased wages anyway, that it had not been able to get the laborers to work for less, independent of the Government’s demand, and that it probably would not have been able to do so in the future. This is speculation. The probabilities are that it would not have been able to get the laborers to work for less, but whether or not this is so, we do not know. What we do know is that the activating cause of its paying the increased wages was the Government’s demand upon it.
It is true that this was a demand by the project engineer and not by the contracting officer; but the contract and specifications in this case do not contain the usual provision relating to a protest to the contracting officer against any ruling of the defendant’s representatives on the job. In the absence of such a provision the defendant is bound by the wrongful acts of its representatives on the job.
Nor do we think that the provisions of article 15 relating to disputes concerning questions of fact required the contractor to bring the matter to the attention of the contracting officer. Whether or not the contract required plaintiff to pay these wages was one not of fact but of law. Only disputes con *352 cerning questions of fact was the plaintiff required to submit to the contracting officer. The contract did not require it to submit to him a ruling of the project engineer on an interpretation of the contract.
Defendant put the project engineer in charge of the work and it should bear the consequences of any erroneous ruling made by him, in the absence of a provision for a protest to the contracting officer.
Plaintiff is entitled to recover on this item $2,659.47, which includes 71/2 percent for overhead. The additional amount it expended for insurance and taxes, if any, does not satisfactorily appear from the evidence.
3. Plaintiff’s last claim is for the cost of repairing the damage to the piers and footings caused by frost.
The defendant wanted to get the foundations in and the superstructure enclosed before the cold weather set in. This could not be done if work had to await the advertisement for bids and the letting of the contract. In order to start the work immediately defendant issued to plaintiff a change order under their previous contract providing for the erection of the piers and footings for the buildings to be constructed under the instant contract. The piers and footings were constructed under this change order.
All of the piers and footings had not been built prior to the onset of cold weather and practically no work had been done on the superstructure of the buildings; hence, there was nothing on the piers and footings to hold them down and prevent them from being displaced by the action of the frost. Many of them were displaced, and after the thaw it was necessary to realign them, which was done at considerable cost. Plaintiff asked for additional compensation of $11,-500.93 therefor, but the contracting officer ruled that it was plaintiff’s responsibility to protect the work that it had done, and if it had failed to do so and the piers got oiit of alignment, it was its responsibility to fix them.
This ruling we think was correct. The specifications contain the following provision under the heading of “care of work”:
a. The contractor * * * shall be responsible for the proper care and protection of all materials delivered *353 and work performed until completion and final acceptance.
b. The contraótor shall provide temporary heating, covering, and enclosures as necessary and to the satisfaction of the Constructing Officer to protect all work and material against damage by dampness and cold, to dry out the buildings properly, and to facilitate completion of the work: * :i: *
The contractor knew or should have known that the action of the frost would get the piers out of alignment, and under this provision of the contract it should have taken the necessary precaution against this. We think it is clear that the plaintiff is not entitled to recover on this item.
It results that plaintiff is entitled to recover $2,659.47. Judgment for this amount will be entered. It is so ordered.
Madden, Judge; Littleton, Judge; and Jones, Chief Justice, concur.